## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

CRYSTAL LEANNE KOCSIS,

      Plaintiff,

v.                                  Case No.  4:16-cv-529-RH/MJF

FLORIDA STATE UNIVERSITY BOARD
OF TRUSTEES,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff, Crystal Leanne Kocsis ("Plaintiff"), proceeding *pro se* and *in forma pauperis*, brought this civil action pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681*, et seq.* (Doc 1). Plaintiff raised two claims: (1) hostile environment harassment based on her sex; and (2) retaliation. This cause is before this court on the Defendant's motion for summary judgment. (Doc. 65). Plaintiff responded (Doc. 69), and  the Defendant filed a reply. (Doc. 71). For the reasons set forth below, the undersigned respectfully recommends that the District Court grant summary judgment in favor of the Defendant on the Plaintiff's claims.[1]

---

[1] The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

## I.    Background

From fall 2013 through September 2016, the Plaintiff was a graduate student pursuing a Ph.D. at Florida State University's College of Criminology and Criminal Justice. (Doc. 1 at 4-7, ¶ 1; Doc. 66 at 1).[2] The Plaintiff was admitted late in summer 2013 to begin attending classes in fall 2013. (Doc. 69 at 9).

During the fall 2013 semester—the only semester in which the Plaintiff alleged that harassment occurred—the Plaintiff was enrolled in a seminar on research methods taught by Dr. Marc Gertz.[3] (Doc. 1 at 4; Doc. 66 at 3, ¶ 8). The Plaintiff alleged that, throughout the semester, Dr. Gertz made disparaging comments to and about female students. (Doc. 1 at 4, ¶¶ 2-4; Doc. 66 at 3, ¶ 8; Doc. 67-3 at 18-19). In particular, he "frequently made comments about the way female students looked, dressed, wore their hair, and he commented about tattoos on their bodies." (Doc. 1 at 4, ¶ 2). Dr. Gertz also allegedly made racial and ethnic comments to minority students. (*id.*). Not one of Dr. Gertz's remarks was directed at the

---

[2] Citations are to the page number shown on the court's electronic docket (ECF).

[3] In her complaint, Plaintiff named Dr. Gertz and other individuals as defendants. A plaintiff may bring a Title IX claim only against the grant recipient itself, *i.e.*, the educational institution. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257, 129 S. Ct. 788, 796 (2009) (noting that Title IX does not authorize a "suit against school officials, teachers, and other individuals"); *Hartley v. Parnell*, 193 F.3d 1263, 1270 (11th Cir. 1999) (noting that Title IX claim may be brought only against a grant recipient such as a local school district—and not against individuals). The District Court, therefore, dismissed the claims against the individual defendants. (Doc. 31).

Plaintiff. (Doc. 67-4 at 8-9). Statements by Dr. Gertz that Plaintiff found offensive included the following:

- "Now whether she [a student] is pretty or not, that could be an argument."

- "You [a female student] can't expect to get by on your looks forever."

- Referring to a female student as "short and ugly."

- "Ellie [a student] is not only short, Ellie is short and ugly."

- To a black student: "You're black; you voted for Obama."

- To a Hispanic student: "Oh Javier, you're Hispanic, you must go to church somewhere."

(Doc. 1 at 4, ¶¶ 2-4).

Plaintiff also alleged that, beginning in August 2013, and continuing through the entire fall semester, Dr. Gertz ordered students to buy bagels for him. (Doc. 1 at 4, ¶ 5). Each week, Dr. Gertz would select two students to buy bagels for the following week. The week after an examination, however, no student brought bagels, and Dr. Gertz's teaching assistant remarked, "And no one thought to take the initiative and buy bagels." According to Plaintiff, this indicated that students could expect trouble if they failed to provide Dr. Gertz with bagels. (*id.*).

On October 8, 2013, Dr. Gertz returned graded examinations to the students. (*id.* at 5, ¶ 6). While the class looked on, Dr. Gertz divided the students by their letter

grade. (*id.*). Allegedly he then took each of the letter-grade subgroups (students receiving an A, B, C, *et cetera*) into his office, one subgroup at a time, and told each student their numerical grade in front of the subgroup. (*id.*). Therefore, each student in a particular letter-grade group learned the numerical grade of every other student within the group. (*id.*). Apparently the Plaintiff found this offensive, but nothing in the record indicates that only women or only men were affected by this practice.

On October 15, 2013, Dr. Gertz discussed the results of another professor's midterm examination. (*id.* at ¶ 7). He mentioned the students who had done well, but opined that "a lot of students had done miserably" and that the other professor "was really dismayed by the poor exam scores." (*id.*). Again, the record does not indicate that his comments were directed at only women or only men.

On November 12, 2013, Plaintiff was scheduled to take Dr. Gertz's final examination at the University's Student Disability Resource Center "("SDRC") because she was "a registered student with disabilities." (Doc. 1 at 5, ¶ 8). Dr. Gertz was aware of this because Plaintiff had submitted to Dr. Gertz a "student disability notice" issued by the SDRC. (*id.*). Nevertheless, Dr. Gertz failed to provide the examination to the SDRC. (*id.* at ¶ 8). The SDRC's examination administrator repeatedly asked Dr. Gertz for the examination but received no response. (*id.*). Eventually, Plaintiff had to walk across campus and enter the classroom while other

students were taking their examinations and, in front of them, ask Dr. Gertz's exam proctor if the proctor could provide a copy of the examination. (*id.*).

On November 26, 2013, Plaintiff spoke with Dr. Carter Hay about Dr. Gertz's offensive comments. (*id.* at 5, ¶ 9; Doc. 66 at 3-4, ¶ 9; Doc. 67-3 at 37). Plaintiff possessed audio recordings of Dr. Gertz's class and offered these to Dr. Hay. (Doc. 1 at 5, ¶ 9). Dr. Hay declined and instead referred the Plaintiff to Dean Thomas Blomberg ("Dean Blomberg"). (*id.*). Dean Blomberg was the Dean of the College of Criminology and Criminal Justice at the University. Dr. Hay then emailed Dean Blomberg to notify him that the Plaintiff had been to his office "in a fairly agitated state speaking of things that Marc Gertz says and does in his Research Methods course that she finds offensive and inappropriate." (Doc. 67-3 at 59).

After complaining to Dr. Hay, Plaintiff alleged that she noticed "subtle peculiarities" in her grades and "in professional interactions with other faculty." (Doc.1 at 5, ¶ 10). "Not wanting to file an official complaint for fear of retaliation," Plaintiff first "attempted to resolve the arbitrary grading individually with the professors." (*id.*).

As part of the doctoral program at the University, "Doctoral candidates are considered for vacant assistantships both after they are accepted into the program and during their studies," and these assistantships pay a stipend and entail a tuition waiver. (Doc. 66 at 2, ¶ 5). The University had awarded assistantships to the majority

of graduate students in the Plaintiff's program. These assistantships are awarded by a committee of professors. During the relevant period, Dr. Carter Hay, Dr. Kevin Beaver, and Dr. Brian Stults served on the committee. (Doc. 66 at 2-3, ¶¶ 5-6). In awarding assistantships to first year students, the committee considered an applicant's Graduate Record Examinations ("GRE") scores, prior grade point average, and overall strength of the admissions application. (Doc. 67-2 at 10). After a graduate student's first year, the committee also considered an applicant's program GPA, progress through the required courses, and progress through program milestones, among other performance indicators. (*id.)*.

According to the record, students did not apply for teaching assistantships. (Doc. 67-4 at 14). Rather, each spring, the Defendant would consider students for teaching assistantships that would commence the following academic year. (Doc. 67-2 at 10; Doc. 67-4 at 14; Doc. 69 at 9, 10). Because Plaintiff was not admitted to the Defendant until summer 2013, she obviously was not considered for a teaching assistantship in spring 2013. (Doc. 69 at 9). The Defendant considered her for a teaching assistantship in spring 2014 and spring 2015, but elected not to award one to the Plaintiff. (Doc. 1 at 6, ¶ 12; Doc. 66 at 2, ¶ 3; Doc. 67-2 at 10; Doc. 69 at 9-10).

In June 2015, the Plaintiff sought to file "an official complaint" with "FSU's Office of Equal Opportunity and Compliance (EOC)." (Doc. 1 at 6, ¶ 14). Plaintiff

first tried to hand deliver a complaint to Assistant Director Amber Wagner, but Wagner refused to accept it. (*id.*). The Plaintiff asked if she could email her complaint to "the Title IX Director's (Jennifer Broomfield) email address" but Wagner told her that it was not yet set up, so instead she could "try emailing" her complaint to Dr. Jennifer Buchanan, an assistant vice-president. (*id.*).

On June 17, 2015, the Plaintiff "made contact" with Dr. Buchanan, but on the following day, Dr. Buchanan informed Plaintiff that "she had emailed the complaint to Jennifer Bloomfield." (*id.* at ¶ 15). On June 18, 2015, Plaintiff filed an official complaint with the University's Office of Equal Opportunity and Compliance. (*id.* at ¶ 16; Doc. 67-3 at 2). On September 11, 2015, the "EOC issued a determination and investigative summary." (Doc. 67-3 at 2). The conclusion was that "…some of the alleged events occurred, [but] were not enough to rise to the level of a policy violation." (*id.* at 3).

On October 7, 2015, Plaintiff "filed an official complaint against FSU with the United States Department of Education, Office of Civil Rights." (Doc. 1 at 7, ¶ 21). On December 23, 2015, the Office of Civil Rights "granted a 'waiver of the 180-day filing requirement' covering the allegations that have occurred from 2013-2015 . . . ." (*id.* at ¶ 22). On November 18, 2015, Plaintiff initiated an informal grade appeal regarding a grade given to her by a Dr. Mears. (*id.* at ¶ 22). On February 3, 2016, "FSU refused to review" her grade appeal. (*id.* at ¶ 23). On May 29, 2016,

Plaintiff "was forced to leave FSU . . . due to FSU's unwillingness to resolve the harassment and retaliation, which resulted in the denial of a tuition waiver, teaching assistantship, and permission to take comprehensive exams which are required for a PhD."[4] (*id.* at ¶ 24).

## II.   Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986). An issue of fact is "material" if it could affect the outcome of the case. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004); *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) ("The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.").

---

[4] In her deposition, the Plaintiff testified that she left the University partially because of problems with her rheumatoid arthritis, but also because she believed she could not progress further without an assistantship or funding of her education. (Doc. 67-4 at 5-6).

In addition, when addressing a motion for summary judgment, a court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hickson*, 357 F.3d at 1260 (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510). At "the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S at 249, 106 S. Ct. at 2510-11. A "scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry . . . asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict . . . ." *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512.

All "justifiable inferences" must be resolved in the nonmoving party's favor so long as there is a genuine dispute as to the relevant facts. *Beard v. Banks*, 548 U.S. 521, 529, 126. S. Ct. 2572, 2578 (2006); *see Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). "If reasonable minds could differ as to the import of the

evidence, however," summary judgment should not be granted. *Anderson*, 477 U.S. at 250-51, 106 S. Ct. at 2511.

## III.    Discussion

### A.    Plaintiff's Hostile Environment Claim Under Title IX

Defendant first argues that the Plaintiff failed to set forth sufficient evidence to create a genuine issue of material fact as to her hostile educational environment claim. (Doc. 65 at 7-8).

Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280, 118 S. Ct. 1989, 1994 (1998). The term "discrimination" under Title IX includes teacher-on-student sexual harassment that creates a hostile classroom environment. *See Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 75, 112 S. Ct. 1028, 1037 (1992) (stating that a teacher's sexual harassment of a student is covered by Title IX); *Sauls v. Pierce Cty. Sch. Dist.*, 399 F.3d 1279, 1283 (11th Cir. 2005) (noting that "a teacher's sexual harassment of a student constitutes actionable discrimination for purposes of Title IX"); *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 749 (2d Cir. 2003) (noting that Title IX prohibits "teacher-on-student hostile educational environment sexual harassment").

The Supreme Court has construed Title IX to include a private right of action against a covered learning institution. *Cannon v. Univ. of Chicago,* 441 U.S. 677, 709, 99 S. Ct. 1946, 1964 (1979); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007). Remedies for a violation of Title IX include damages. *Franklin,* 503 U.S. at 76, 112 S. Ct. at 1038.

In Title IX actions brought based on *student-on-student* harassment, the Supreme Court has held that the plaintiff must show that any harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive" the plaintiff "of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650, 119 S. Ct. 1661, 1675 (1999). In cases brought pursuant to Title VII of the Civil Rights Act of 1964, the Supreme Court has instructed courts to consider the pervasiveness and severity of the offensive conduct in assessing whether such conduct rises to the level of harassment sufficient to constitute a hostile environment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 1003 (1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22, 114 S. Ct. 367, 370 (1993); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405-2406 (1986). At least two courts of appeals have likewise applied that standard to "faculty-on-student" harassment cases. *See Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir.

2007) (en banc) ("coach-on-student" case); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002) ("discipline matron-on-student" case).

The Eleventh Circuit, however, has held that in "teacher-on-student" Title IX harassment cases, the plaintiff "need not establish" that a teacher's conduct was "so severe, pervasive, and objectively offensive" that it denied the plaintiff "equal access to educational programs or opportunities." *Sauls*, 399 F.3d at 1284. In courts governed by Eleventh Circuit precedent, therefore, a plaintiff seeking to recover damages for "teacher-on-student sexual harassment must establish two things to survive summary judgment: (1) an official with authority to take corrective measures had actual knowledge of the harassment; and (2) the official with such knowledge was deliberately indifferent to the misconduct. *Sauls*, 399 F.3d at 1284; *Davis v. Dekalb Cty. Sch. Dist.*, 233 F.3d 1367, 1372 (11th Cir. 2000) (per curiam); *Floyd v. Waiters*, 171 F.3d 1264, 1264 (11th Cir. 1999).[5]

## 1.    *Actual Knowledge by an Official with Sufficient Authority*

Defendant argues that Plaintiff did not provide notice to an "official with the authority to take corrective measures" until June 18, 2015, when she filed her official

---

[5] Notably, these cases involved elementary and high school students who purportedly were sexually victimized by teachers, which may have contributed to the Eleventh Circuit's conclusion that it was unnecessary to consider severity and pervasiveness. *See Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1243-44 (10th Cir. 2001) (holding that one incident of sexual assault resulted in a sexually hostile work environment).

complaint with the Defendant's Title IX coordinator. (Doc. 65 at 6).

"Title IX is predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation." *Gebser*, 524 U.S. at 290, 118 S. Ct. at 1999 (citing 20 U.S.C. § 1682); *see Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1254 (11th Cir. 2010); *Davis*, 233 F.3d at 1371. Therefore, a school may not be held liable under Title IX on a theory of *respondeat superior* or mere constructive notice. *Gebser*, 524 U.S. at 285, 118 S. Ct. at 1997; *Doe*, 604 F.3d at 1254; *Sauls*, 399 F.3d at 1284 n.3. Rather, Title IX liability arises only when an official of the school district, who at a minimum possessed authority to institute corrective measures on the district's behalf, had "actual knowledge" of a teacher's misconduct. *Gebser*, 524 U.S. at 290, 118 S. Ct. at 1999; *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 349 (11th Cir. 2012); *Baynard v. Malone*, 268 F.3d 228, 238 (4th Cir. 2001); *Floyd v. Waiters*, 171 F.3d 1264, 1264 (11th Cir. 1999). Furthermore, the substance of that "actual knowledge" must be sufficient to alert the school official of the harassment and allow the school to initiate remedial and preventive measures. *See Gebser*, 524 U.S. at 291, 118 S. Ct. at 2000; *Liese*, 701 F.3d at 349; Doe, 604 F.3d at 1255.

Plaintiff's conversation with Dr. Hay—in which she reported that Dr. Gertz had made "inappropriate comments"—does not satisfy either Title IX's "actual knowledge" or "appropriate person" requirements. The parties do not dispute that, on November 26, 2013, Dr. Hay explicitly told Plaintiff that he was "NOT in a

position to supervise faculty" and that she needed to take her concerns to Dean Blomberg. (Doc. 67-3 at 56). Therefore, Plaintiff knew that Dr. Hay was not an "appropriate person" under *Gebser*. Plaintiff, however, elected not to address her complaints to Dean Blomberg. (Doc. 67-3 at 27; Doc. 67-4 at 33-34).

Plaintiff argues, however, that she did not file an official complaint sooner because the Defendant did not have a full-time Title IX coordinator until April 2015. (Doc. 69 at 4). Title IX, however, does not require that actual notice be given only to a Title IX coordinator. Instead, Title IX's notice requirement may be satisfied by providing notice to any "official of the recipient entity with authority to take corrective action to end the discrimination." *See Gebser*, 524 U.S. at 290, 118 S. Ct. at 1999; *Doe*, 604 F.3d at 1255; *Davis*, 233 F.3d at 1371. For example, Dean Blomberg stated that if Plaintiff had reported harassing conduct to him, he would have been able to "reach out to Professor Gertz to cease and desist." (Doc. 67-3 at 27). Thus, he appears to be at least one of the "appropriate" persons to whom the Plaintiff could have complained.

Furthermore, Plaintiff's discussion with Dr. Hay did not impart knowledge of harassment as required by Title IX. Plaintiff's comments to Dr. Hay were not sufficient to alert a University official that Dr. Gertz was allegedly harassing the Plaintiff. In her November 27, 2013, email to Dr. Hay, Plaintiff stated ". . . at the present I have no intentions of filing a formal complaint against Gertz." (Doc. 67-3

at 61). She also retreated from the accusations she had made the day before and stated that she "should be able to make it through," that Dr. Gertz meant well, and that Dr. Gertz's comments were merely disparaging name-calling. (*id.*). Thus, even if Dr. Hay had been the appropriate person to receive notice, Plaintiff's communications (including the email), would not have put Dr. Hay on notice that the Plaintiff believed that Dr. Gertz's conduct constituted illegal harassment based on sex. Indeed, because of Plaintiff's email, any reasonable person would have understood that Plaintiff did not consider Dr. Gertz's conduct to be harassment. Therefore, her communications fall short of imparting actual knowledge to an appropriate official.

Plaintiff also contends that—regardless of her complaints—the Defendant had notice of sexual discrimination since at least 1989. (Doc. 69 at 2, ¶ 3). In support of this argument, Plaintiff references six complaints against Dr. Gertz filed between 2002-2005 and a 2003 report by MGT of America. (Doc. 69 at 6).

Notably, Plaintiff failed to provide details of the prior complaints. Specifically, as to five of the six prior complaints, the Plaintiff did not provide information: (1) about the means used to make these complaints; (2) to whom the complaints were made; (3) whether these were official complaints; (4) the exact content of the complaints, and (5) the outcome of the complaints. (*see id.*). Furthermore, apparently all of these complaints concerned conduct that occurred

long before 2013. In light of the substantial interval between those complaints and the comments that the Plaintiff endured in fall 2013, it is difficult to fathom how these complaints would have provided the Defendant with knowledge about Dr. Gertz's conduct in 2013. Plaintiff, therefore, has not shown that any of this provided the Defendant with knowledge of harassment in 2013.

Furthermore, constructive notice is not enough to hold a Title IX recipient liable for conduct of a professor. *See, e.g., Gebser*, 524 U.S. at 285, 118 S. Ct. at 1997; *Doe*, 604 F. 3d at 1254; *Sauls*, 399 F.3d at 1284 n.3. Therefore, any argument that the Defendant "should have known" of potential harassment by one of its professors because of past harassment complaints is merely an attempt to create a constructive notice theory of liability. *See Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003) (noting that constructive notice is established when "management reasonably should have known of" the harassment); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002) ("Actual notice is established by proof that management knew of the harassment, whereas constructive notice will be found where . . . management should have known of it."). Because Title IX does not make educational institutions liable merely for constructive notice, old complaints of harassment do not help the Plaintiff's case.

As to the report by the consulting firm MGT of America, Inc. ("MGT"), in September 2003, Defendant hired MGT to conduct a review of the School of

Criminology and Criminal Justice. (Doc. 70 at 8). This was a broad review that examined the entire program in an effort to address issues related to the size and diversity of the student body, the degree requirements for undergraduate and graduate level programs, and the overall environment within the college. The review also concerned itself with faculty issues such as diversity, hiring practices, retention, and collegiality among peers. (*See generally* Doc. 70 at 4-59).

MGT's review did not focus on any individual faculty member or even the Ph.D. program. Rather, it was a review of both the undergraduate and graduate programs. (*id.*). Dr. Gertz is mentioned only twice in the entire report. First, he is listed as a faculty member hired between 1975 and 1986, and that he may be part of a group of professors frequently called "the core of the faculty, especially the graduate faculty." (*id.* at 23). He is also listed in a chart of current faculty. (*id.* at 25). There is nothing in the report indicating that Dr. Gertz ever harassed any students. This report—from 2003—obviously did not give the Defendant knowledge about any harassment that purportedly occurred in 2013.

Plaintiff, therefore, has provided evidence that the Defendant knew of her alleged harassment only in June 18, 2015, when she filed her official complaint with the Defendant's Office of Equal Opportunity and Compliance. The question then becomes whether the Defendant was deliberately indifferent to Plaintiff's June 2015 complaint.

## 2. *Deliberate Indifference to the Alleged Harassment*

Under Title IX, an educational institution is not liable for teacher-on-student sexual harassment unless the educational institution official with knowledge of the harassment was deliberately indifferent to the teacher's misconduct. *Sauls*, 399 F.3d at 1283; *see Gebser*, 524 U.S. at 277, 118 S. Ct. at 1933. Deliberate indifference occurs only if the school official's "'response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Doe*, 604 F.3d at 1259 (quoting *Davis*, 526 U.S. at 648, 119 S. Ct. at 1674). In other words, deliberate indifference is the equivalent of an "official decision" by the school "not to remedy the violation." *Hill v. Cundiff*, 797 F.3d 948, 968 (11th Cir. 2015) (quoting *Gebser*, 524 U.S. at 290, 118 S. Ct. at 1999); *Liese*, 701 F.3d at 350; *Doe*, 604 F.3d at 1259.

To constitute deliberate indifference, a school's response at a minimum must have caused a student to undergo harassment or made a student liable to or vulnerable to harassment. *Davis*, 526 U.S. at 645, 119 S. Ct. at 1672; *Hill*, 797 F.3d at 973 ("A clearly unreasonable response causes students to undergo harassment or makes them more vulnerable to it."). In order to avoid deliberate indifference liability, therefore, an institution merely must respond to the allegation of harassment "in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 648-49, 119 S. Ct. at 1674; *Roe v. St. Louis Univ.*, 746 F.3d 874, 882 (8th Cir. 2014).

Accordingly, "deliberate indifference is a high standard to meet . . . ." *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009).

In the instant case, the Defendant did not exhibit indifference, deliberate or otherwise. Once the Defendant received notice of the alleged harassment on June 18, 2015, its Office of Equal Opportunity and Compliance ("EOC") began a formal investigation within three weeks. (Doc. 65 at 12; Doc. 67-3 at 2-54). Specifically, the investigation began on July 2, 2015, and was concluded on September 11, 2015. (Doc. 67-3 at 2). Investigators interviewed Dean Blomberg, Dr. Gertz, Dr. Hay, Dr. Mears (a professor), Dr. Ashley Rubin (then a professor), Javier Ramos (a student), and Noell Sweeny (a student and Gertz's teaching assistant). (*id.*). Investigators examined emails between Dr. Hay, Plaintiff, and Dean Blomberg. (*id.* at 55-61). The investigators also reviewed the Plaintiff's audio recordings of Dr. Gertz's classes. (*id.* at 2). They sought an interview of the Plaintiff, but she declined the invitation. (*id.*).

The investigation concluded that the evidence did not "establish a violation of the Defendant's Sexual Harassment Policy." (Doc. 67-3 at 8). The Defendant, however, did find that Dr. Gertz made inappropriate comments and referred the matter to the Office of the Provost and Executive Vice President for consideration of corrective action or counseling. (*id.*). On September 25, 2015, Dean Blomberg sent an email to the Defendant's administrators stating that he had spoken with Dr.

Gertz regarding his comments and noted that Dr. Gertz agreed to be more careful in the future. (*id.* at 67).

Thus, within three weeks of receiving Plaintiff's complaint, the EOC office initiated a two-month long investigation that resulted in Dean Blomberg counseling Dr. Gertz. (Doc. 67-3). The Defendant investigated Plaintiff's complaint and took reasonable measures to ensure that harassment would not occur in the future. Plaintiff has not shown, therefore, that the Defendant was deliberately indifferent to her allegations of harassment. In light of that failure, the District Court should grant the Defendant's motion for summary judgment on Plaintiff's claim of harassment.

### C.   Plaintiff's Retaliation Claim Under Title IX

The Defendant also seeks summary judgment on Plaintiff's claim of retaliation.  (Doc. 65 at 10-11). Defendant argues that the Plaintiff failed to set forth evidence sufficient to establish that she was subjected to retaliation. (*id.*).

In her complaint, Plaintiff contends that, after she spoke with Dr. Hay regarding Dr. Gertz's behavior in November 2013, she began noticing "subtle peculiarities" with her grades, which she attempted to resolve with the relevant professors. (Doc. 1 at 8). Specifically, she alleged that: (1) her grade in Dr. Gertz's class "dropped from a 94 to an 88; (2) her grade in her fall 2013 penology class, taught by Dr. Eric Baumer, was recorded as an "A-" when it should have been recorded as an "A"; (3) her grade in her fall 2013 casual methods class, taught by

Dr. Gary Kleck, was recorded as a "B-" when it should have been recorded as a "B";[6] (4) her grade in her spring 2015 special topics class, taught by Dr. Daniel Mears, was recorded as an "A-" when it should have been recorded as an "A." (*id.* at 5, ¶ 11). The Plaintiff also alleged that the Defendant did not investigate any of these grading discrepancies. (*id.*).

### 1.    *Legal Standard for Retaliation Claims Under Title IX*

"The private right of action implied by Title IX encompasses claims of retaliation." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171, 125 S. Ct. 1497, 1502 (2005) (holding that "where the funding recipient retaliates against an individual because he has complained about sex discrimination," the individual may bring suit under Title IX); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 693 (4th Cir. 2018); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014). Although the Eleventh Circuit has not issued a published decision that outlines the standard for establishing a retaliation claim under Title IX, other courts of appeals have employed the standard of retaliation found in Title VII of the Civil Rights Act of 1964. *See, e.g., Feminist Majority Found.*, 911 F.3d at 694; *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 564 (3d Cir. 2017); *Ollier*, 768 F.3d at 867; *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 248 (2d Cir. 1995). Likewise, in an unpublished opinion, the Eleventh Circuit has suggested that courts should

---

[6] Any grade below a "B" is a failing grade in the graduate program.

follow Title VII's framework in Title IX retaliation cases. *See Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 911 (11th Cir. 2013) (noting that it would "apply the framework for Title VII retaliation claims" to the plaintiff's Title IX retaliation claim).

### 2.    *Prima Facie Case of Retaliation*

To establish a *prima facie* case of retaliation under Title IX, a plaintiff must show that:

(1) he engaged in statutorily protected expression or activity;

(2) the defendant took action that would be considered materially adverse to a reasonable person in the plaintiff's position; and

(3) a causal link existed between the two events (*i.e.*, a retaliatory motive played a substantial part in prompting the adverse action).

*Ollier*, 768 F.3d at 867; *Bowers*, 509 F. App'x at 911 (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68-69, 126 S. Ct. 2405, 2415 (2006)); *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012); *Papelino v. Albany Coll. of Pharm.*, 633 F.3d 81, 91 (2d Cir. 2011); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002).

### (a)    <u>Protected Activity</u>

Under Title VII—and presumably also Title IX—there are two forms of activity that are protected from retaliation: (1) opposition to any practice that is

unlawful under the relevant Act; and (2) participating in an investigation, proceeding, or hearing related to practices that are unlawful under the relevant Act. *See* 42 U.S.C. § 2000e-3(a); *see also Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999). An individual who seeks protection for opposing unlawful practices must have a "good faith, reasonable belief" that the conduct opposed is unlawful. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). Also, the belief must by "objectively reasonable." *Id.* The objective reasonableness of a belief that the complained-of conduct was unlawful must be measured against existing substantive law. *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 n.2 (11th Cir. 1998) (failure to charge the Plaintiff who opposes a practice with substantive knowledge of the law "would eviscerate the objective component of our reasonableness inquiry").

Here, as discussed above, Plaintiff's email to Dr. Hay indicated that the Plaintiff herself did not believe that Dr. Gertz's comments were unlawful. In her November 27, 2013, email to Dr. Hay, Plaintiff stated ". . . at the present I have no intentions of filing a formal complaint against Gertz." (Doc. 67-3 at 61). She also stated that she "should be able to make it through," that Dr. Gertz meant well, and that Dr. Gertz's comments were merely disparaging name calling. (*id.*). She further stated that "[m]y only hope is that maybe Dean Blomberg can dissuade Gertz from treating his students in a disparate manner and calling them names." (Doc. 67-3 at

61). Plaintiff, therefore, appears to have believed in November 2013 that Dr. Gertz's comments were not unlawful under Title IX such that a formal complaint was necessary or even possible. Accordingly, Plaintiff herself clearly did not consider her November 2013 communications with Dr. Hay to be opposition to activity that Title IX prohibits.

In addition, a reasonable person would not have believed that Dr. Gertz's comments were unlawful either. Dr. Gertz's comments were not sufficiently frequent, severe, pervasive, physically threatening, humiliating, or oppressive to violate Title IX. Rather, they were isolated utterances and the type of "sporadic use of abusive language, gender-related jokes, and occasional teasing" which the Supreme Court said would not fall within the prohibitions of Title VII. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2284 (1998). These concepts were well established by November 2013, and so Plaintiff would not have been objectively reasonable in believing that Dr. Gertz's comments were unlawful under Title IX. These communications, therefore, do not satisfy the first element of a *prima facie* case of retaliation.

In contrast, Plaintiff clearly filed a formal complaint in June 2015. (Doc. 1 at ¶ 14). That activity is sufficient to establish the first element of a *prima facie* case of retaliation. That complaint clearly constitutes "participation" in an investigation insofar as it was the catalyst for the Defendant's formal investigation. *Clover*, 176

F.3d at 1351. That investigation resulted in multiple interviews, an evidence review, and the submission of an investigative summary. (Doc. 67-3). Accordingly, Plaintiff has submitted sufficient evidence to indicate that, in June 2015, she participated in a Title IX investigation, and thereby satisfied the first element of a *prima facie* case of retaliation.

### (b)    Materially Adverse Action

As to the second element, a plaintiff must show that he suffered some adverse action that a reasonable person in the plaintiff's position would consider materially adverse. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68, 126 S. Ct. at 2415. Thus, not every action that might be considered retaliation is protected; instead, only "retaliation that produces an injury or harm." *Id.*, 548 U.S. at 67, 126 S. Ct. at 2414. Conduct is materially adverse when it would have dissuaded a reasonable person in the plaintiff's position "'from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68, 126 S. Ct. at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation mark omitted); *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir. 2001) ("The asserted impact cannot be speculative and must at least have a tangible adverse effect . . . .").

Here, Plaintiff argues that the Defendant took three materially adverse actions against her: (1) she was forced the leave the University; (2) the University lowered

her grades; [7] and (3) the University denied her a teaching assistantship and a tuition waiver that would come with the assistantship.

As to her claim that she was forced the leave the University, in her deposition, the Plaintiff testified that she left the University partially because of problems with her rheumatoid arthritis, but also because she believed she could not progress further without an assistantship or funding of her education. (Doc. 67-4 at 5-6). That is not the equivalent of the Defendant ousting her. Had the Defendant ejected the Plaintiff, that would constitute a sufficiently adverse action to satisfy the second element of a *prima facie* case of retaliation. Plaintiff, however, has not pointed to any evidence indicating that the Defendant expelled her, and she did not allege that she was expelled in her complaint. (Doc. 1 at 7, ¶ 24). The Defendant cannot be held liable for adverse actions it did not take.

As to any reduction in her grades, that is sufficiently serious to constitute a materially adverse action. Similarly, a reasonable graduate student in the Plaintiff's position would have found denial of a teaching assistantship and a tuition waiver

---

[7] Plaintiff also complained about the Defendant's grade appeal process, which she deemed dysfunctional because the appeal panel was composed of non-anonymous students who took the same classes as the Plaintiff. (Doc. 1 at 8-9). According to the Plaintiff, the students on the panel likely would defer to the professors rather than risk retaliation. This appeal process may be dysfunctional, but that does not make it retaliatory. Because this appeal process applied to all students (not just the Plaintiff) and apparently predated the Plaintiff's complaints, its existence cannot be retaliation for actions that the Plaintiff took. *Nichols v. CSG Sys., Inc.*, 245 F. App'x 937, 941 (11th Cir. 2007).

materially adverse. Therefore, Plaintiff has submitted sufficient evidence to establish the second element of a *prima facie* case of retaliation.

> **(c)**    **Causal Link Between the Adverse Actions and the Protected Activity**

Demonstrating a causal connection sufficient for a retaliation claim requires evidence that the "decision-makers were aware of the protected conduct or activity and acted adversely as a result." *Shannon v. BellSouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2007). Where there is an absence of actual evidence proving a causal connection, a plaintiff may rely on the temporal proximity of the protected activity and the adverse action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). The temporal proximity, however, must be "very close" when this proximity is the only evidence of causation. *Id.* When there is a substantial interval between the protected activity and the adverse action, a retaliation complaint fails as a matter of law. *Id.*

"To establish a causal connection, a plaintiff must show that the decisionmakers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000). "It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected

expression." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997).

As noted above, Plaintiff's protected expression or activity occurred in June 2015. By necessity, actions that the Defendant took *before* June 2015 could not have been motivated by a desire to retaliate against Plaintiff for a complaint she made in June 2015. *See Kenfield v. Colo. Dep't of Pub. Health & Env't.*, 557 F. App'x 728, 733 (10th Cir. 2014) ("By its very nature, retaliatory conduct must come after the protected activity."). When adverse actions occur prior to the protected activity, this demonstrates "no causality at all" regarding the protected activity. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508, 1511 (2001); *see Burrage v. United States*, 571 U.S. 204, 210, 134 S. Ct. 881, 888 (2014) (noting that a cause must be the antecedent of a result). Most of the retaliatory actions alleged by the Plaintiff occurred before June 2015. Accordingly, Plaintiff has not established this element with respect to any "retaliation" that occurred before June 2015.

Furthermore, even if the Plaintiff's November 2013 communications with Dr. Hay constituted protected activity or expression, Plaintiff still cannot show a causal connection between the communications and the adverse actions.

With regard to her grade in Dr. Gertz's fall 2013 class dropping from 94 to 88, Plaintiff offers no evidence as to when or how that reduction occurred. She offers scant evidence regarding the factors that contributed to her grade, and there is no

evidence indicating whether the Plaintiff's performance warranted a grade of "94" or some other grade. Also, she offers no evidence that Dr. Gertz even knew about the Plaintiff's communications with Dr. Hay. Therefore, Plaintiff has not shown that Dr. Gertz knew of her communications and that he changed her grade to retaliate.

The same is true of Plaintiff's grade in Dr. Baumer's fall 2013 penology class. She received an "A-" even though she received a 94 numerical grade and 93-100 was traditionally considered worthy of an "A." (Doc. 1 at 8). Plaintiff offered no evidence that Dr. Baumer knew of her comments to Dr. Hay, much less that he based his grading decision on his knowledge of Plaintiff's comments.

Similarly, Plaintiff has not presented evidence that the "B-" grade she received from Dr. Kleck in May 2015, or the "A-" grade she received from Dr. Mears in spring 2015, were causally related to her communications with Dr. Hay in November 2013. First, unlike Dr. Gertz's and Dr. Baumer's grades, these grades were not given in close temporal proximity to her discussions with Dr. Hay. In *Bowers*, the Eleventh Circuit held that a three-month gap between the statutorily-protected action and retaliatory act was too attenuated to show causation. *Bowers*, 509 Fed. App'x. at 911; *see also Thomas*, 506 F.3d at 1364 (holding that a three-month gap was insufficient to show causation). Here, Dr. Kleck and Dr. Mears awarded Plaintiff her respective grades approximately 18 months after Plaintiff's discussion with Dr. Hay. That is insufficient to demonstrate causation. Second, as with the grades from Dr.

Gertz and Dr. Baumer, Plaintiff offered no evidence that Dr. Kleck or Dr. Mears knew of her complaint to Dr. Hay, much less that the professors' grading decisions were motivated by a desire to retaliate.

As to Plaintiff's claim that the Defendant denied her teaching assistantships and tuition waivers from 2014 to 2016, it is undisputed that the decision regarding assistantships and waivers for the fall 2013 semester were made in spring 2013, which preceded Plaintiff's discussion with Dr. Hay in November 2013 and her admission to the University as a graduate student. Thus, this obviously was not retaliation for Plaintiff's remarks to Dr. Hay. (Doc. 69 at 9). The Defendant considered the Plaintiff for a teaching assistantship in spring 2014 and spring 2015, but elected not to award one to the Plaintiff. (Doc. 1 at 6, ¶ 12; Doc. 66 at 2, ¶ 3; Doc. 67-2 at 10; Doc. 69 at 9-10). Notably, these decisions preceded Plaintiff's complaint of harassment in June 2015. Thus, the rejection of the Plaintiff could not have been caused by her complaint.

The assistantships and waivers were awarded by a committee of professors that, during the time in question, included Dr. Hay. (Doc. 66 at 2-3, 5-6). Thus, one of the decisionmakers, Dr. Hay, knew of Plaintiff's November 2013 comment before assistantships were awarded in spring 2014 and spring 2015. Plaintiff, however, has offered no evidence that Dr. Hay related Plaintiff's November 2103 complaint to

other members of the committee.[8] Plaintiff also has not shown that Dr. Hay alone

caused the committee to reject Plaintiff based on Plaintiff's comments to Dr. Hay.

Instead she relies on pure speculation and conjecture. Causation "must be based on

more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*,

366 F.3d 869, 875 (10th Cir. 2004); *see Cordoba v. Dillard's, Inc.*, 419 F.3d 1169,

1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact."); *Little*

*v. Liquid Air Corp.*, 37 F.3d 1069, 1079 (5th Cir. 1994) (en banc) (per curiam)

(noting that when "causation evidence is primarily based on conjecture and

speculation" it is "insufficient to create a genuine issue of material fact for trial").

Furthermore, the email exchanges between Dr. Hay and Plaintiff and Dr. Hay

and Dean Blomberg indicate not animosity but apparent concern for Plaintiff. They

also include Plaintiff's acknowledgement of Dr. Hay's concern for her.  In her email

to Dr. Hay, for example, Plaintiff stated, "I completely understand and thank you so

much for your support." (Doc. 67-3 at 61). In his email to Dean Blomberg, Dr. Hay

gave the Dean a "heads up" about Plaintiff's concerns and explained as follows:

> I reminded her to stay focused on succeeding even when working with
> others she finds offensive. I emphasized that this was NOT a suggestion
> that she should tolerate something she sees as inappropriate, but
> instead, a reminder to keep the two considerations independent from
> one another. (I'm not sure she understood my point).

---

[8] Plaintiff could have deposed Dr. Hay and specifically asked him about this.

(Doc. 67-3 at 61). Because this is the only evidence in the record touching upon Dr. Hay's motivation, Plaintiff has not met her burden to show that the committee's rejection of her applications for a teaching assistantship was motivated by retaliatory animus. For these reasons, the Plaintiff has failed to establish a *prima facie* case of retaliation.

### 3.    *Legitimate Non-Retaliatory Reasons for Adverse Actions*

As a second independent basis to grant summary judgement for the Defendant on Plaintiff's retaliation claim, Defendant put forth legitimate non-retaliatory reasons for the actions it took.

If a plaintiff establishes a *prima facie* case, the employer then has the burden of producing at least one legitimate non-retaliatory reason for the adverse actions. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093 (1981); *Walker v. Mortham*, 158 F.3d 1177, 1183 (11th Cir. 1998); *Combs*, 106 F.3d at 1528 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973)). "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the . . decision had not been motivated by" a retaliatory animus. *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 257, 101 S. Ct. at 1096). If the employer articulates a legitimate nonretaliatory reason for its decision, the inference of retaliation that would arise from a *prima facie* case disappears. *Reeves*

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S. Ct. 2097, 2106 (2000); *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 1481 (1983); *Walker*, 158 F.3d at 1184.

Here, although Plaintiff failed to establish a *prima facie* case of retaliation, the Defendant proffered legitimate non-discriminatory reasons for its actions. As to the teaching assistantships, the evidence put forth by the Defendant indicates that the Plaintiff was less qualified than the graduate students to whom the teaching assistantships were awarded. Specifically, Plaintiff's GPA and GRE scores generally were lower than those of the graduate students to whom the Defendant awarded the assistantships. (Compare Doc. 70 at 61-68 with Doc. 67-1 at 2-4).

Dean Blomberg further stated that Plaintiff was not selected because: (1) Plaintiff's GRE scores did not meet admissions standards; (2) one of her reference letters was "quite negative"; (3) she was struggling in the program; (4) she failed two classes by scoring a "B-" in each class; and (5) she was "performing at the bottom level of our Ph.D. students." (Doc. 67-3 at 28). Dean Blomberg, therefore, set forth performance-based reasons for the Defendant's decisions not to grant the Plaintiff an assistantship and tuition waiver. These are legitimate non-retaliatory reasons for the adverse actions.

### 4.    *Plaintiff Did Not Show That the Defendant's Proffered Reasons Were Mere Pretext*

Once a defendant submits at least one legitimate non-retaliatory reason for the adverse action, "the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255, 101 S. Ct. at 1094-95; *see Aikens*, 460 U.S. at 715, 103 S. Ct. at 1481-82. The plaintiff then has the burden of showing that the defendant's proffered reason is a mere pretext. *Reeves*, 530 U.S. at 143, 120 S. Ct. at 2106; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 516, 113 S. Ct. 2742, 2752 (1993). Pretext means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995).

To meet her burden at this step, a plaintiff must produce evidence "including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by" the educational institution were not the real reasons for the adverse actions. *Combs*, 106 F.3d at 1528. A plaintiff may establish pretext by producing evidence that reveals "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [the defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1348-49 (11th Cir. 2007) (quoting *Cooper v. Southern*

*Co.*, 390 F.3d 695, 725 (11th Cir. 2004)) (internal quotation marks omitted); *see*

*Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010).

Here, Plaintiff points to the following facts as evidence of pretext: (1) Dean Blomberg stated that one of her recommendation letters was "quite negative" yet the Defendant did not attach the letter to the Investigative Summary; (2) Dean Blomberg stated that Plaintiff's GRE score was below admissions standards, but this is belied by the fact that the Defendant admitted the Plaintiff as a graduate student; (3) Plaintiff's GRE *verbal score* was higher than some of the students to whom the Defendant awarded teaching assistantships; and (4) Defendant did not include all of the relevant GRE scores.

None of this indicates that the legitimate non-retaliatory reasons put forth by the Defendant are mere pretext. First, as to the relevant GRE scores that purportedly were not included, the Plaintiff could have asked for these scores during discovery, but apparently elected not to do so. The fact that those were missing from the record does not, therefore, show that Defendant was untruthful. Second, Dean Blomberg did not state that the decision to grant assistantships were based solely on GRE scores. Rather, according to him, the GRE scores were considered along with GPA and general progress in the program. Thus, the fact that the Plaintiff may have scored higher than other students on *one part* of the GRE does not establish pretext.

Plaintiff has not pointed to "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [the defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer*, 509 at 1348-49. Therefore, Plaintiff has not shown that the Defendant's proffered reasons were simply a pretext for retaliation.

For these reasons, the District Court should grant summary judgment for the Defendant on Plaintiff's claim of retaliation.

## IV.    Conclusion

Accordingly, for the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1.    The Defendant's Motion for Summary Judgment (Doc. 65) be **GRANTED**.

2.    Judgment be entered in favor of the Defendant.

3.    The Clerk be directed to close the file.

At Panama City, Florida, this <u>27th</u> day of February, 2019.

/s/ *Michael J. Frank*

**Michael J. Frank**
**United States Magistrate Judge**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636**.